**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------- )
BAYER HEALTHCARE LLC,                                        )
                                                            )
                        Plaintiff,                          )        C.A. No. 16-1122-RGA
                                                            )
              v.                                            )
                                                            )
BAXALTA INCORPORATED,                                       )
BAXALTA US INC., and                                        )
NEKTAR THERAPEUTICS,                                         )
                                                            )
                        Defendants.                         )
----------------------------------------------------------- )

## DEFENDANTS' OPPOSITION TO
## MOTION FOR ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 285

*Of Counsel:*

Edgar H. Haug
Angus Chen
Porter F. Fleming
Richard F. Kurz
Erika V. Selli
Elizabeth Murphy
Haug Partners LLP
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800
ehaug@haugpartners.com
achen@haugpartners.com
pfleming@haugpartners.com
rkurz@haugpartners.com
eselli@haugpartners.com
emurphy@haugpartners.com

March 15, 2019

Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Nicole K. Pedi (#6236)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
pedi@rlf.com

*Attorneys for Defendants
Baxalta Inc., Baxalta US Inc., and
Nektar Therapeutics*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iv

I. Introduction .......................................................................................................... 1

II. Legal Standards .................................................................................................... 1

III. Argument .............................................................................................................. 2

    A. Bayer's Motion Should Be Denied Because It Does Not Comply with Rule 54(d)(2) .......................................................................................... 2

    B. Bayer's Allegations of Litigation Misconduct Are Meritless ................................ 4

        1. Bayer's Allegations of Litigation Misconduct Regarding the *Markman* Order Are Unfounded ............................................................ 4

        2. Baxalta's Use of Worldwide Financial Data Was Proper ........................... 7

            a. The Worldwide Financial Data from Shire Was Produced Within Weeks of Bayer's Last-Minute Subpoena ....................................................................................... 7

            b. Trial Testimony Verified the Authenticity and Accuracy of the Worldwide Financial Data ........................... 8

        3. Bayer's Other Disclosure-Related Complaints Do Not Support a Finding of Litigation Misconduct .......................................... 10

        4. Baxalta Did Not Engage in Misconduct During the Five-Day Trial ........................................................................................ 13

            a. Baxalta's Defenses Were Entirely Appropriate ............................. 13

                i. Baxalta's Use of § 102(f) Prior Art Was Well-Justified ....................................................................... 13

                ii. Baxalta's Defense Concerning "functional factor VIII" Was Reasonable ............................................. 14

            b. Baxalta Never Made Misrepresentations to the Jury ..................... 15

            c. Baxalta's Objections at Trial Were Entirely Appropriate ..................................................................................... 18

    C. Bayer's Pervasive Litigation Misconduct Further Demonstrates that Its Motion Should Be Denied .......................................................................... 18

IV.    Conclusion ....................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Checkpoint Sys., Inc. v. All-Tag Security S.A.*,
    858 F.3d 1371 (Fed. Cir. 2017)..................................................................... 2

*Chrimar Holding Co., LLC v. ALE USA Inc.*,
    732 F. App'x 876 (Fed. Cir. 2018) ................................................................ 12

*Edwards Lifesciences AG v. CoreValve, Inc.*,
    No. 08-91-GMS, 2011 WL 446203 (D. Del. Feb. 7, 2011)................................ 7

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    No. 2:15-CV-1202-WCB, 2017 WL 3044558 (E.D. Tex. July 18, 2017)...................... 15

*Ferring Pharm. Inc. v. Par Pharm., Inc.*,
    No. 1:15-cv-00173-RGA, 2018 WL 6696040 (D. Del. Dec. 19, 2018) ........................ 15

*Gaymar Indus. v. Sub-Zero Prods., Inc.*,
    790 F.3d 1369 (Fed. Cir. 2015)..................................................................... 18

*Havemann v. Colvin*,
    537 F. App'x 142 (4th Cir. 2013) .................................................................. 3

*Heinen v. Northrop Grumman Corp.*,
    671 F.3d 669 (7th Cir. 2012) ....................................................................... 3

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)..................................................................... 2

*Johnson v. Leading Edge Recovery Solutions, L.L.C.*,
    No. 12-cv-03103-CMA-CBS, 2013 WL 5313255
    (D. Colo. Sept. 23, 2013) ............................................................................ 3

*Kennedy v. Schneider Elec.*,
    893 F.3d 414 (7th Cir. 2018) ....................................................................... 3

*King v. Midland Credit Mgmt., Inc.*,
    549 F. App'x 791 (10th Cir. 2013) ................................................................ 3

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)..................................................................................... 2

*Oddzon Prods., Inc. v. Just Toys, Inc.*,
    122 F.3d 1396 (Fed. Cir. 1997)..................................................................... 13

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ....................................................................... 3

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    866 F.3d 1330 (Fed. Cir. 2017)....................................................................... 18, 19

*Sorenson v. Wolfson*,
    683 F. App'x 33 (2d Cir. 2017) ................................................................................ 3

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    254 F. Supp. 3d 680 (D. Del. 2017)........................................................................ 11

*Wedgetail Ltd. v. Huddleston Deluxe, Inc.*,
    576 F.3d 1302 (Fed. Cir. 2009)................................................................................ 2

*Whittingham v. BlueVine Capital, Inc.*,
    No. 3:17-cv-720-JAG, 2018 WL 6601086 (E.D. Va. Dec. 17, 2018) ................................ 3

*Wordtech Sys. v. Integrated Networks Sols., Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010)................................................................................ 10

**Statutes**

35 U.S.C. § 102(f)........................................................................................... 13, 14

35 U.S.C. § 103 ..................................................................................................... 13

35 U.S.C. § 285 .................................................................................... 1, 2, 18, 19

**Rules**

Fed. R. Civ. P. 54 ................................................................................................... 3

Fed. R. Civ. P. 54(d)(2)................................................................................. 2, 4, 20

Fed. R. Civ. P. 54(d)(2)(B) ................................................................................ 1, 19

Fed. R. Civ. P. 54(d)(2)(B)(ii) ............................................................................. 1, 2

Fed. R. Civ. P. 54(d)(2)(B)(iii) ......................................................................... 1, 2, 3

## I.      Introduction

Bayer's request for attorney fees (D.I. 421) should be denied because it improperly seeks to impose a penalty against Baxalta for failing to win this patent-infringement suit.  Although binding precedent precludes such a penalty, the Court need not even reach Bayer's arguments because Bayer's motion is barred under Federal Rule of Civil Procedure 54(d)(2)(B).  Federal Circuit case law unambiguously establishes that Rule 54(d)(2)(B) must be followed in moving for attorney fees under 35 U.S.C. § 285.  Bayer's motion fails to provide the information required by this Rule, including the amount or a fair estimate of fees sought.  Fed. R. Civ. P. 54(d)(2)(B)(ii) and (iii).  Bayer's motion should be denied for this reason alone.

Even if this Court reached the merits of Bayer's motion (which it should not), the motion should be denied because this case is not "exceptional."  Nothing that Baxalta has done in this case constitutes litigation misconduct, which is the only basis on which Bayer relies for arguing that this is an exceptional case.[1]  Indeed, much of Bayer's motion is simply an attempt to re-litigate discovery-related arguments that Bayer previously pursued and this Court rejected.  And the remainder of Bayer's contentions rest on unfounded allegations that Baxalta willfully disregarded this Court's *Markman* order and misled the jury.  Bayer is not entitled to a departure from the American Rule merely because it prevailed at trial.  Bayer's motion should be denied.

## II.     Legal Standards

"[A]ny claim to attorney fees must be processed in compliance with Rule 54(d)(2)(B).  No provision in [35 U.S.C. §] 285 exempts requests for attorney fees thereunder from compliance with Rule 54(d)(2)(B)."  *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377,

---

[1] As will be demonstrated below, Bayer's rhetoric—including inflammatory language such as "frivolous," "fabricated," "coached," and "unwillingness to play by the rules"—is baseless and unwarranted.  (Bayer Br. 1-2, 4, 7).  As the Court noted at the close of the case: "it's been a very well-tried case.  So I appreciate all your efforts on both sides."  (Tr. 1592:25-1593:2).

1386 (Fed. Cir. 2005).  Rule 54 requires, among other things, that the moving party identify the judgment and specify or estimate the fees sought.  Fed. R. Civ. P. 54(d)(2)(B)(ii) and (iii).

Under 35 U.S.C. § 285, an "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  A party seeking attorney fees under § 285 must prove its entitlement to fees by a preponderance of the evidence. *Id.* at 558-59.  Importantly, however, "fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'"  *Checkpoint Sys., Inc. v. All-Tag Security S.A.*, 858 F.3d 1371, 1376 (Fed. Cir. 2017) (quoting *Octane Fitness*, 572 U.S. at 548).

## III.   Argument

### A.   Bayer's Motion Should Be Denied Because It Does Not Comply with Rule 54(d)(2)

As a threshold matter, Bayer's failure to comply with Rule 54(d)(2) requires denial of its motion for fees under 35 U.S.C. § 285.  *IPXL*, 430 F.3d at 1386.  A motion for attorney fees must "specify the judgment . . . entitling the movant to the award," ***and*** "state the amount sought or provide a fair estimate of it."  Fed. R. Civ. P. 54(d)(2)(B)(ii) and (iii).  Bayer's § 285 motion fails to do either, thus requiring denial of the motion.  Indeed, the Federal Circuit has found that it is reversible error to grant a motion for attorney fees that does not comply with Rule 54(d)(2). *IPXL*, 430 F.3d at 1384-86 (reversing the grant of § 285 attorney fees because the motion did not comply with the timing requirements of Rule 54(d)(2)).  The Federal Circuit has also concluded that an award of attorney fees was properly denied where the moving party failed, among other things, to state the amount sought or provide a reasonable estimate as required by Rule 54(d)(2). *Wedgetail Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1306 (Fed. Cir. 2009).

2

Numerous other courts have similarly denied motions for attorney fees when a party fails to identify or estimate the amount of fees sought under Rule 54(d)(2)(B)(iii). *See, e.g.*, *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 676-77 (9th Cir. 2017) (affirming the denial of fees where the moving party failed to provide a fair estimate of the amount sought); *Sorenson v. Wolfson*, 683 F. App'x 33, 36 (2d Cir. 2017) (affirming the denial of attorney fees where the moving party did not provide an estimate of attorney fees in its initial motion); *King v. Midland Credit Mgmt., Inc.*, 549 F. App'x 791, 793-94 (10th Cir. 2013) (finding a motion for attorney fees properly denied where an estimate of fees was not provided); *Havemann v. Colvin*, 537 F. App'x 142, 149 (4th Cir. 2013) ("[W]e cannot ignore Havemann's failure to 'state the amount sought or provide a fair estimate of it' . . . [b]ecause Havemann failed to make a proper plea for attorney's fees before the district court, the district court did not err in denying his request."); *Whittingham v. BlueVine Capital, Inc.*, No. 3:17-cv-720-JAG, 2018 WL 6601086, at *2 (E.D. Va. Dec. 17, 2018) (denying motion for attorney fees for failing to comply with Rule 54 where the movants "state that they seek reasonable attorneys' fees and costs, but do not state the amount they seek or provide a fair estimate of it"); *Johnson v. Leading Edge Recovery Solutions, L.L.C.*, No. 12-cv-03103-CMA-CBS, 2013 WL 5313255, at *2 (D. Colo. Sept. 23, 2013) ("[T]he Court declines to grant attorney fees because Plaintiff did not include a fair estimate of fees in his initial motion, making the instant motion untimely."). The Court should do the same here.

As Judge Easterbrook has said, "this court is not inclined to award sanctions in favor of a party that cannot be bothered to follow the rules itself." *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 671 (7th Cir. 2012); *see also Kennedy v. Schneider Elec.*, 893 F.3d 414, 421 (7th Cir. 2018) ("[W]e cannot help but note the irony inherent in a party's procedurally improper request that the court sanction an opposing party for failing to comply with other procedural

3

rules."). This Court should not take the extraordinary step of awarding fees to Bayer when Bayer did not follow the Federal Rules.

### B. Bayer's Allegations of Litigation Misconduct Are Meritless

Although the Court need not reach the issue due to Bayer's failure to follow Rule 54(d)(2), Bayer's motion also fails on the merits. None of the conduct that Bayer alleges—alone or in combination—warrants an award of attorney fees. Indeed, as explained below, many of Bayer's factual assertions are demonstrably false.

#### 1. Bayer's Allegations of Litigation Misconduct Regarding the *Markman* Order Are Unfounded

Bayer devotes a significant portion of its brief to the theory that Baxalta disobeyed the Court's *Markman* order. (Bayer Br. 4-9). Bayer is wrong.

*First*, Bayer asserts that Dr. Zalipsky improperly opined that the prosecution history made it clear that lysine PEGylation cannot be "random." (Bayer Br. 4-5). Contrary to Bayer's accusations, Dr. Zalipsky's expert reports followed and certainly did not willfully violate this Court's *Markman* order. The Court found that, with respect to the claim term "at the B-domain," "Plaintiff did not disclaim PEGylation at any amine or carboxy site in factor VIII during prosecution" because "Plaintiff stated that conjugation at amines and carboxy sites cannot ensure PEGylation at the B-domain—not that conjugation cannot occur at amines and carboxy sites." D.I. 195 at 15-16. In contrast, with respect to the separate claim term "isolated polypeptide conjugate," the Court had found that Bayer had disclaimed "random" PEGylation. Dr. Zalipsky interpreted and opined on these statements: "In my opinion, the Court was observing in the context of 'at the B-domain' that it is possible for conjugation to occur at amine or carboxy sites within the B-domain—not holding that conjugation at amine or carboxy sites in the B-domain is 'non-random.'" D.I. 248 at 373, Ex. C ¶ 10. This is a reasonable interpretation, as the Court left

4

the meaning of the term "random" open as a factual matter for the jury.  *See* D.I. 335 at 3 ("I do

not think it is necessary to further construe my construction by explicitly defining 'random.'").

Dr. Zalipsky's opinions were informed by his knowledge of how a POSA would interpret

"random" PEGylation: "As set forth in my Rebuttal Expert Report, the '520 patent and file

history make clear, and it is well understood by POSAs, that amine-targeting PEGylation results

in random conjugation, which is consistent with the disclaimer found by the Court."  (Ex. A,

Zalipsky Reply Report ¶ 10).[2]  Thus, far from ignoring the claim construction, Dr. Zalipsky

offered his opinion with the *Markman* order firmly in mind.

It was not apparent until the December 21, 2018 summary-judgment opinion that the

Court disagreed with Dr. Zalipsky's interpretation of the phrase "[a]ny conjugation with

[amines] is random."  (D.I. 319 at 8).  Dr. Zalipsky's expert reports were submitted long before

this.  Bayer's disagreement with Dr. Zalipsky's interpretation (which was made before the

Court's later clarification of the *Markman* order at the summary-judgment stage) does not

demonstrate litigation misconduct, let alone misconduct that warrants an award of attorney fees.

Bayer's reliance on the Court's decision on motions *in limine* (Bayer Br. 6-7) is

misplaced.  These motions were prepared and exchanged with Bayer for filing before the Court's

clarifying summary-judgment decision.  The record, therefore, at most shows that Baxalta was

unclear regarding the scope of the new claim term—"random"—which was not proposed by

either party nor defined in the *Markman* order.  *See* D.I. 335 at 3.  Because Baxalta never

willfully or otherwise disregarded the Court's orders, Baxalta's understanding of what

constitutes "random" PEGylation does not support a finding of litigation misconduct.

Nor did Baxalta disregard the Court's *Markman* order at trial.  Contrary to Bayer's

---

[2] "Ex.__" refers to exhibits attached the Declaration of Richard F. Kurz, filed herewith.

assertions (Bayer Br. 7), Baxalta never asked Dr. Pan whether "random" conjugation equates

with amine PEGylation. Rather, Baxalta asked whether the lysine PEGylation of Factor VIII

performed by Nektar and delivered to Dr. Pan constituted "random" PEGylation. (Tr. 959:12-

23). Bayer cannot credibly suggest otherwise, given that Baxalta's *very next question* to Dr. Pan

was whether Nektar or Bayer ever performed a non-random lysine conjugation of Factor VIII.

(Tr. 959:24-960:4). Had Baxalta been trying to suggest to the jury that all lysine conjugation, by

definition under the Court's claim construction, is "random," Baxalta never would have asked

that next question. Nor does the remaining testimony that Bayer cites suggest otherwise. Rather,

it all showed Dr. Pan's understanding that the Factor VIII lysine PEGylation *that Nektar was*

*performing* was "random" PEGylation. (Tr. 970:1-9, 977:6-23, 979:5-9, 989:24-990:10).

Whether PEGylation is random is one of the central disputes between the parties (*see* D.I. 319 at

9 ("[T]here is a genuine dispute of fact as to whether Adynovate® is manufactured by non-

random conjugation")), and there was nothing improper about eliciting testimony concerning

Nektar's Factor VIII lysine PEGylation. Moreover, Bayer's citation to the side-bar (Bayer Br. 7)

is especially misplaced: the Court *overruled* Bayer's objection. (Tr. 982:4-5). Bayer's

remaining insinuations (Bayer Br. 7-8) that Drs. Walensky and Zalipsky violated the *Markman*

order are also unfounded, as Bayer did not object to any of the cited testimony.

Moreover, when confronted with numerous documents—including internal Bayer

documents and emails from the '520 patent inventors—stating that Adynovate® uses random

PEGylation, Bayer's expert Dr. Ravetch relied on the same reasoning and definition of "random"

that Bayer now argues is improper. Specifically, he admitted that PEGylation "was random

within the B-domain" because "[t]hey couldn't identify each PEG attached to lysines within the

B-domain." (Tr. 619:23-620:6, 626:5-8, 652:7-18; see Tr. 469:6-12; D.I. 436 at 11-13).

Baxalta never willfully violated the Court's *Markman* order or any other Court order.

Accordingly, Bayer's allegations of litigation misconduct on this basis should be rejected.[3]

### 2.    Baxalta's Use of Worldwide Financial Data Was Proper

#### a.    The Worldwide Financial Data from Shire Was Produced Within Weeks of Bayer's Last-Minute Subpoena

Bayer incorrectly argues that this case is exceptional because a single, six-page document with information obtained from third-party Shire was produced after the close of discovery. (Bayer Br. 9-10). Bayer is incorrect. The background and timeline of this single-document production is instructive and demonstrates that it does not render the case exceptional.

As an initial matter, the financial document is a Shire document that was not kept at Baxalta and was obtained from Shire. (D.I. 222, Ex. 1 Raveendran Dec.; Kurz Decl. ¶ 2). It has information that Shire's management uses for long-range plans, in the ordinary course of business, that are presented to Shire's Board of Directors. (Tr. 1186:21-23, 1188:10-19). On June 5, 2018, ten days before the close of fact discovery, Bayer subpoenaed a Shire subsidiary to request documents concerning costs, forecasts, and other data related to Adynovate® and demanded a response within one week. (Ex. B). Baxalta and this Shire subsidiary are separate entities and have a common parent: Shire plc.

After Shire employees identified the costs data on Shire's Hyperion system, the information was promptly produced on August 8, 2018. (Ex. C; Kurz Decl. ¶ 2). The respective declaration of Ms. Raveendran and testimony of Mr. Dewan—both of whom are Shire employees—confirmed that the information was from Shire's Hyperion system, was maintained in the ordinary course of business, and was accurate. (Tr. 1183:1-1184:10; D.I. 222 Exhibit 1 ¶¶

---

[3] Even if the Court were to find that Baxalta improperly attempted to reargue claim construction, this does not render the case exceptional. *See Edwards Lifesciences AG v. CoreValve, Inc.*, No. 08-91-GMS, 2011 WL 446203, at *13 (D. Del. Feb. 7, 2011) (declining to award attorney fees even where a party had improperly attempted to reargue claim construction).

6-20).  Although Shire keeps this information in a format that identifies separate costs, there is no dispute that Baxalta did not maintain this information in that format.  Thus, Baxalta was unaware of and could not have produced the Shire information sooner.  In 2017, following the acquisition of Baxalta, Shire began preparing long-range plans that tracked cost information on a product level.  (D.I. 222, Ex. 1 ¶¶ 5, 8, 11).  After Dr. Addanki's initial July 13, 2018 report and previously undisclosed damages theories with flawed profitability opinions, Shire's long-range-plan information was discovered.  Baxalta's counsel was unaware of this information until it was identified by Shire's employees.  (Kurz Decl. ¶ 2).

In view of the August 8th production Baxalta offered: (i) an opportunity for Bayer to depose a witness on the six-page document; and (ii) an extension of time for Bayer's damages expert to serve his reply expert report.  Bayer refused.  (D.I. 222 Exhibit 4).  Instead, Bayer moved to strike the document—that it requested—as untimely produced.  The Court found that Bayer was not prejudiced by the production, and permitted the use of the document.  (D.I. 362 at 5).  The document was admitted at trial without objection.  (Tr. 1184:11-14).

In sum, within approximately one month after learning Bayer's previously undisclosed damages theory and two months from the issuance of Bayer's subpoena, information was identified in Shire's files and was produced immediately upon discovery.  Baxalta offered (i) post-production depositions and (ii) extra time for Bayer to prepare an expert report on damages using this information.  Bayer moved to exclude the document and the Court denied the motion for lack of prejudice.  This is not the type of behavior that renders a case exceptional.

### b.     Trial Testimony Verified the Authenticity and Accuracy of the Worldwide Financial Data

Bayer's complaint about the veracity of the Adynovate® worldwide financial data (Bayer Br. 9-10) also lacks merit.  Contrary to Bayer's argument, Baxalta did not produce documents

showing over 80% in profits.  Rather, it showed ~80% profit when only cost of goods ("COGS")

were accounted for (and other costs were not accounted for), as shown by the testimony that

Bayer cites.  (Tr. 774:11-775:9).  Moreover, Bayer wrongly characterizes Mr. Hackel's

testimony, arguing that he confirmed that Bayer's inflated estimate of Baxalta's costs "included

costs and licensing royalties."  (Bayer Br. 9.)  In fact, Mr. Hackel testified that COGS—which is

the only cost that Bayer used in estimating profit—did not include many expenses, such as sales

and marketing costs.  (Tr. 724:2-6).  He further testified that COGS includes only manufacturing

costs.  (Tr. 719: 11-12 ("[T]he cost of goods sold is the units sold times the standard cost."),

715:12-21 ("So the standard cost is when you – when you are in a manufacturing plant and you

produce a product, you use the material components, the overhead in the plant, the labor, the

quality release.")).  Bayer's expert confirmed that COGS excluded these additional costs.  (Tr.

774:2-3 (admitting his belief that COGS includes only manufacturing costs and royalties),

807:22-25 (admitting sales and marketing costs not included), *see* 804:17-20)).  And, contrary to

Bayer's allegations, Mr. Hackel testified that he did not know whether royalties were included in

the COGS or were instead part of Other Cost of Sales, or "OCOS," a value not tracked in the

document that Bayer relied upon.  (Tr. 718:4-15).

Moreover, Mr. Hackel confirmed that Bayer's method of calculating Baxalta's profit—

using only COGS based on standard costs—is incorrect, and explained that "you would also

have to include R&D costs, you would have to also include sales and marketing costs."  (Tr.

720:13-15).  Another fact witness, Mr. Schaffnit, confirmed that all of these costs existed, were

not part of COGS, and would need to be accounted for in determining profit.  (Tr. 940:21-941:

12).  Bayer has never alleged, and has no basis to now assert, that Baxalta incurred zero costs in

marketing, selling, global medical affairs, ongoing research and development, and recurring and

ongoing launches in multiple countries.  *See Wordtech Sys. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1321-22 (Fed. Cir. 2010) (granting new trial based upon introduction of damages calculation that assumed the defendant "incurred zero costs" because that conclusion was "'clearly not supported by the evidence' and 'based only on speculation or guesswork'").

Nor is Bayer correct that "Baxalta served post hoc financials designed to deflate the damages award to which Bayer was entitled" (Bayer Br. 9).  The testimony at trial established that the information about which Bayer is complaining was: (i) logged in 2017 and therefore, contrary to Bayer's implication, could not have been created in response to Bayer's expert reports; (ii) kept in the ordinary course of business; and (iii) accurately reflected the information kept in Shire's database.  (Tr. 1183:2-1184:10).  Indeed, DTX-471A was admitted without objection.  (Tr. 1184:11-14).  Bayer cannot now challenge the authenticity of the document.  Nor can it complain that it was improper to consider this document with 2017 information, given that the jury instructions specifically provided that the jury could consider "[e]vidence of things that happened after the infringement began" for the purpose of "show[ing] what the parties would have anticipated during the hypothetical negotiation."  (Tr. 1460:19-24).

### 3.     Bayer's Other Disclosure-Related Complaints Do Not Support a Finding of Litigation Misconduct

Bayer further argues that Baxalta committed litigation misconduct by: (i) allegedly delaying its discovery disclosures; (ii) dropping certain invalidity defenses at trial; and (iii) allegedly overdisclosing exhibits.  As demonstrated below, Bayer is wrong on all scores.

*First*, Bayer has no basis for fees based on Baxalta's alleged "delay[] [in] its discovery disclosures" during expert discovery.  (Bayer Br. 18).  The Court denied Bayer's motion to strike, specifically finding that any of Baxalta's alleged shortcomings resulted in "insignificant prejudice to [Bayer]" and found no evidence of bad faith with respect to this grievance.  (D.I.

362 at 8-9, 12).  The Court further found that Bayer, in refusing Baxalta's offer to cure any

prejudice by permitting Bayer to serve a surreply, demonstrated that it was not significantly

prejudiced.  (D.I. 362 at 11).  Similarly, Baxalta's service of supplemental expert reports (Bayer

Br. 18) cannot support a finding of litigation misconduct, especially since the Court expressly

permitted the supplementation.  (Pretrial Conference Tr. at 20:10-15; D.I. 338).  Indeed, these

supplemental reports were necessitated by Bayer's failure to produce relevant documents during

discovery.  (D.I. 313).  Instead of producing them in this case, Bayer withheld certain relevant

documents, producing them only in the related *Baxalta v. Bayer* litigation (C.A. No. 1:17-cv-

1316-RGA).  The supplemental reports did not contain any new opinions and only sought to rely

on Bayer's late-produced documents in accordance with the parties' agreements and the Court's

order to that effect.  (C.A. 17-1316, D.I. 70 ¶ 1 ("[A]ny materials subject to the Protective Order

in the C.A. No. 16-1122 action may be used in this action and vice versa.")).

*Second*, Bayer cannot justify an award of fees simply because Baxalta elected not to

pursue certain invalidity theories at trial, particularly in the context of the 14-hour time

constraints faced by each party.  (Bayer Br. 18).  As an initial matter, the Court rejected Bayer's

argument that Baxalta had 17 defenses and took no issue with the fact that Baxalta was still

deciding which invalidity theories it was going to pursue.  (Jury Selection Tr. 94:9-95:14).

Indeed, after the Court pointed out the proper way to count defenses, Bayer acknowledged that

Baxalta was presenting only 6 defenses.  (Jury Selection Tr. 94:9-17).[4]  Bayer also wrongly

---

[4] Therefore, Bayer's reliance on *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680 (D. Del.
2017) is misplaced.  There, unlike here, attorney fees were awarded where, among other things,
Cisco: (i) reduced 19 invalidity theories to only 2 theories on the eve of trial; (ii) contradicted
the Court's claim construction at trial; (iii) pursued defenses that were contrary to its internal
documents; (iv) improperly sought sanctions based on the claim that SRI's royalty-sharing
program violated the criminal bribery statute; and (v) designated nearly 48,000 lines of
testimony but presented only 22 lines at trial.  This case is not analogous to *SRI*.

accuses Baxalta of belatedly disclosing prior art on which it would rely (Bayer Br. 18-19)—an

issue that the Court heard argument on at trial and rejected.  (Tr. 857:9-860:18; Tr. 1134:14-18).

In sum, the Court should not penalize Baxalta for streamlining the case.  *See Chrimar Holding*

*Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 891 (Fed. Cir. 2018) (nonprecedential) (affirming

the denial of attorney fees where the defendant "pressed a large number of defenses and

counterclaims for years, only to drop most of them . . . late in the litigation, even during trial").

*Third*, Bayer's complaint that Baxalta overdisclosed exhibits (Bayer Br. 19) is especially

meritless.  Contrary to Bayer's accusation that Baxalta used only 2 of 58 disclosed exhibits with

Dr. Walensky, Dr. Walensky in fact relied on *all but one* of the exhibits during his direct

examination.  (DDX-7).  Baxalta disclosed all of the exhibits that formed the basis for its

demonstratives, because Bayer had lodged numerous objections to most of Baxalta's

demonstratives throughout the trial.  To ensure that Baxalta would not be precluded from using

the underlying exhibits in the event that the demonstratives were excluded, Baxalta disclosed the

exhibits.  There was nothing improper about this.  Indeed, the only overdisclosure of exhibits

here was by Bayer.  For example, Bayer disclosed **98 exhibits** for use during the February 1st

testimony of Dr. Ravetch but **used only three**.  (Ex. D; Tr. 1323:12-1344:17).  And unlike Dr.

Walensky, whose slides cited to all of his exhibits, Dr. Ravetch's slides (PDX-9) did not cite to

or rely upon any of Bayer's 95 identified-but-unused exhibits.

Nor is Baxalta culpable for not using all of its demonstratives during closing arguments.

Bayer cites no case law granting fees for failure to use all of a party's demonstratives during

time-limited closing statements.  Moreover, Bayer overinflates the number of slides that Baxalta

identified by counting slides that were not in Baxalta's closing slide deck, but that were instead

presented during the evidentiary portion of the trial.  (Bayer Br. 19 (counting 83 "expert

demonstratives")).  In reality, Baxalta disclosed only 70 closing slides—far fewer than Bayer's 114 slides.  *Id.*; PDX 10.  While the pretrial order permitted the parties to use previous evidentiary slides in closing, Baxalta had no obligation to re-disclose them or to use them.  (Tr. 1429:23-1430).  The Court agreed that this is a reasonable interpretation of the pretrial order. (Tr. 1432:1-7).  Regardless, Baxalta narrowed the list of potential demonstratives to be used to about 20.  (*See* Tr. 1431:7-25).  Baxalta's disclosure of closing demonstratives in no way evidences any litigation misconduct.

### 4.   Baxalta Did Not Engage in Misconduct During the Five-Day Trial

#### a.   Baxalta's Defenses Were Entirely Appropriate

Bayer's suggestion that Baxalta pursued frivolous defenses at trial should be disregarded. (Bayer Br. 10-15).

##### i.   Baxalta's Use of § 102(f) Prior Art Was Well-Justified

As an initial matter, Bayer mischaracterizes Baxalta's defenses.  Baxalta never presented a "§ 102(f) claim" at trial.  (Bayer Br. 11).  Rather, Baxalta pursued an obviousness claim that was based, in part, on subject matter that constitutes prior art under 35 U.S.C. § 102(f).  The Federal Circuit has held that "subject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable to that party under a combination of §§ 102(f) and 103."  *Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403-404 (Fed. Cir. 1997).

As set forth in its JMOL brief (D.I. 436 at 21-24), Baxalta's obviousness argument was well-supported.  Prior to November 14, 2005, the '520 patent inventors had received work conducted by Dr. Mary Bossard—first-named inventor of the '223 prior-art patent—and others at Nektar (the "Bossard Work") under a "Research Agreement" executed on December 11, 2003 concerning PEGylated Factor VIII.  (JTX-3).  Nektar's "Deliverables" included samples of full-

13

length Factor VIII, PEGylated by "[r]andom lysine modification" and "[c]ysteine modification."

(JTX-3 at 24-25.)  Inventor Pan was Bayer's point of contact and circulated the Bossard Work to

the other '520 patent inventors prior to November 14, 2005.  (Tr. 961:7-12, 963:10-964:2, 975:2-

10; DTX-723.1; DTX-1001.1.)  The Bossard Work constitutes prior art under § 102(f).

The Bossard Work included full-length Factor VIII with PEGylation at the B-domain and

retained activity.  Based on Nektar's March 2004 results with full-length Factor VIII, inventor

Pan deduced that "PEGylation must be happening in one of four cysteines or some of the four

cysteines in the B-domain."  (Tr. 975:2-976:19; DTX-1001.4; *see also* Tr. 976:20-977:5; DTX-

756.4.)  Pan later received results of PEGylation of full-length Factor VIII at lysines and

cysteines (Tr. 973:13-974:20; DTX-787), which indicated that PEGylation at lysines was "likely

in the B-domain" because there was high retention of activity.[5]  (DTX-756.4; DTX-666-4; DTX-

1001.4.)  The Bossard Work gave the '520 patent inventors a reasonable expectation of success

in PEGylating at the B-domain of full-length Factor VIII, with retention of activity.

Baxalta presented ample evidence at trial for its obviousness defense based on the

Bossard Work as § 102(f) prior art.  Bayer's suggestions to the contrary should be rejected.

### ii.     Baxalta's Defense Concerning "functional factor VIII" Was Reasonable

Contrary to Bayer's assertion, Baxalta neither "ignored its own admissions" nor

"contradicted the intrinsic record" to argue that Adynovate® did not meet the "functional factor

VIII" requirement of the claims.  (Bayer Br. 12).  Bayer makes much of the fact that Baxalta

admitted, in a request for admission, that "Adynovate retains functional factor VIII activity."

(Bayer Br. 13 (citing PTX-1200-A at No. 45)).  Bayer suggests that Baxalta's position that

Adynovate® does not retain **100%** activity after conjugation conflicted with its request-for-

---

[5] Dr. Ravetch conceded that the B-domain is "more exposed, in general."  (Tr. 636:23-637:2.)

admission responses.  But the Court already rightly rejected this theory, as there is nothing

inconsistent between this admission and Baxalta's noninfringement theory.  As this Court noted

in denying Bayer's motion to strike certain expert opinions concerning noninfringement of

"functional factor VIII activity," (D.I. 362 at 6-10), such a theory is not "necessarily contrary to

Defendants' prior admission" because Baxalta is alleging that Adynovate®'s retention of about

50% of the specific activity of unPEGylated Factor VIII is "insufficient to show retention of

functional activity as required by the claims."  (D.I. 362 at 9).  It was Bayer's burden to prove

this issue and it was eminently reasonable for Baxalta to hold Bayer to its burden of proof.

Judge Bryson's reasoning in an analogous situation is instructive:

> It is significant that [Bayer] is seeking fees for being required to
> prove an issue on which it bore the burden of proof.  [Baxalta] in
> effect said to [Bayer]: "It is your burden to prove infringement: Do
> it.  And if your proof falls short in some respect, we will be entitled
> to judgment even in the absence of any affirmative evidence of
> non-infringement from our side."

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL

3044558, at *2 (E.D. Tex. July 18, 2017).  Bayer "cites no cases awarding attorney fees in a

similar situation—that is, against the party without the burden of proof who declines to concede

on an issue at or before trial."  *Id.*  The Court should follow this reasoning and decline to

penalize Baxalta for holding Bayer to its burden.  *See also Ferring Pharm. Inc. v. Par Pharm.,

Inc.*, No. 1:15-cv-00173-RGA, 2018 WL 6696040, at *1-2 (D. Del. Dec. 19, 2018) (rejecting

argument that a defendant's noninfringement position warranted an award of attorney fees).

### b.  Baxalta Never Made Misrepresentations to the Jury

Bayer alleges that Baxalta "attempted to mislead the jury into believing that Bayer

committed some type of fraud by filing the '520 patent application in 2009, after Dr. Pan had left

Bayer[,]" and that "[t]he Court requested that Baxalta correct the misrepresentations."  (Bayer

Br. 15 (citing Tr. 1572:22-1573:1, 1023:3-1024:10)).  Bayer mischaracterizes this exchange.  In actuality, the questions with which Bayer finds fault were asked only after Bayer elicited testimony that Dr. Pan signed his declaration under penalty of perjury.  (Tr. 1010:10-17).[6]  As explained at side-bar, Baxalta was trying to provide context regarding the timing of the declaration.  (Tr. 1025:23-1026:6).  In response, the Court told Mr. Badke that "[i]f you want to clean it up after him, I'll let you do that" and permitted Baxalta's examination to proceed.  (Tr. 1026:8-13).  The Court did not strike any of the testimony discussed at the side-bar, and Bayer's counsel declined the Court's invitation to conduct any further examination on this matter.  (Tr. 1029:14-15 (Q:  "Anything from you, Mr. Badke?"  A:  "No.  I think that's adequate.")).  Nothing in this exchange remotely supports a finding of any type of misconduct, let alone misconduct that would support an award of attorney fees.  Rather, Baxalta's line of questioning was entirely legitimate, given its position that the issued claims, drafted years after Dr. Pan signed the declaration, are not enabled by the '520 patent's disclosure (i.e., the earlier specification that formed the basis for Dr. Pan's declaration).

Ironically, the only misrepresentations here are Bayer's.  *First*, Bayer wrongly alleges that Baxalta "failed to inform the jury that the '520 patent was a continuation of an earlier parent application."  (Bayer Br. 15).  Quite the opposite, Baxalta specifically *did* inform the jury that the '520 patent "was filed as a continuation which meant it was related to the earlier filed application."  (Tr. 1572:24-25).  Given this, and considering that Bayer repeatedly told the jury that the '520 patent was filed as a continuation application (PDX-1.12; PDX-1.16), Bayer's accusation that Baxalta somehow misled the jury is meritless.  *Second*, Bayer wrongly charges

---

[6] Indeed, during closing argument, Bayer stressed that the statements to the PTO were made "under oath subject to penalty of perjury" and that the statements therefore "are as sound and accurate as you can get."  (Tr. 1473:4-9).

Baxalta with "misrepresent[ing] the record before the jury with respect to the derivation defense" by suggesting that information in Bayer's internal documents—i.e., Dr. Pan's notebook— actually came from Nektar.  (Bayer Br. 16 (citing Tr. 1567:11-1568:2)).  Contrary to Bayer's insinuations, it cannot be disputed that the Pan notebook refers to "[n]on-specific fVIII PEGylation at Nektar."  (DTX-0565.39).  Evidence at trial demonstrated that Bayer received work from Nektar consisting of samples of PEGylated Factor VIII, data, and other information. For example, Dr. Bossard confirmed that: (i) Nektar sent Bayer the technical report concerning the full-length Factor VIII work that Nektar did for Bayer  (Tr. 1161:9-12; DTX-892); and (ii) Nektar sent Dr. Pan—then a Bayer employee—samples of PEGylated full-length Factor VIII reaction mixtures (Tr. 1162:13-1163:22).  Importantly, the samples referenced in the Pan notebook are the same samples that Nektar sent to Bayer, as demonstrated by the identical sample designations.  *Compare* Ex. E, highlighted excerpt of DTX-565.39 *with* Ex. F, highlighted excerpt of DTX-892.37.  The '520 patent inventors received the work from Nektar in installments, beginning in February 2004.  (Tr. 224:3-25, 269:2-270:9; JTX-3).  Inventor Pan was Bayer's point of contact. (Tr. 961:7-12).  In that capacity, he received samples from Dr. Bossard and others at Nektar and circulated them to the other '520 patent inventors. (Tr. 963:10-964:2, 975:2-10; DTX-723.1; DTX-1001.1).  Accordingly, it is not credible for Bayer to argue that it was misleading to present the Nektar samples and information as originating from Nektar.

Bayer incorrectly asserts that Baxalta misled the jury by comparing Adynovate® to Bayer's Jivi® product rather than to the '520 patent's claims.  (Bayer Br. 16 (citing Tr. 1061:6-11)).  Nothing in Baxalta's presentation suggested that the jury should make an improper comparison in its infringement analysis.  Rather, Baxalta was simply illustrating the difference between "random" PEGylation and "non-random" PEGylation, by providing an example of each.

17

Nor did Baxalta "mischaracterize[] an email from Dr. Murphy as an admission that Adynovate® was randomly PEGylated." (Bayer Br. 17 (citing Tr. 1538:14-24, 1539:3-14)). Baxalta discussed the email, DTX-1347, which indisputably discusses random lysine PEGylation and contrasts that process with site-specific PEGylation. (DTX-1347; Tr. 1538:14-24). At no time did Baxalta mention Adynovate® in connection with DTX-1347. After this discussion, Baxalta moved on to DTX-2014, a presentation by Dr. Murphy, which indisputably states that Baxter and Nektar were developing a product that is produced by random PEGylation. (DTX-2014.20; Tr. 1539:3-7). There is nothing remotely misleading about this argument, which likely explains why Bayer raised no objection to it during closing arguments.

### c.    Baxalta's Objections at Trial Were Entirely Appropriate

Bayer's allegation that Baxalta "improperly objected multiple times during the direct examination of Dr. Addanki" (Bayer Br. 19-20) is meritless. Baxalta made no more than five objections in order to preserve its rights. Moreover, Baxalta sought a standing objection outside the presence of the jury so as not to interrupt Bayer during its direct examination. (Tr. 784:16-786:8). It is not litigation misconduct to lodge limited objections to preserve the record. (*See, e.g.*, Tr. 759:14-21 (sustaining objection); Tr. 748:25-749:13 (at side-bar, the Court confirmed that Dr. Addanki is "not supposed to be talking about what's in between" the end points)).

### C.    Bayer's Pervasive Litigation Misconduct Further Demonstrates that Its Motion Should Be Denied

An analysis of whether a case is "exceptional" within the meaning of § 285 also requires consideration of "the conduct of the prevailing party that is seeking attorney's fees." *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1340 (Fed. Cir. 2017); *see also Gaymar Indus. v. Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015) (recognizing that "the conduct of the movant" is a relevant factor to determining entitlement to fees under § 285).

Bayer's own misconduct strongly weighs against an award of attorney fees.  For example, Bayer: (i) belatedly disclosed brand-new infringement theories; (ii) tardily produced 111 laboratory notebooks; (iii) withheld relevant documents as demonstrated by productions in the related Jivi® litigation; and (iv) after the close of fact discovery, produced a laboratory notebook from first-named inventor Dr. Pan that Bayer said it had previously been unable to locate for over 5 years.  (D.I. 194; D.I. 313).  Indeed, the Court sanctioned Bayer, ordering: (i) production of a Rule 30(b)(6) witness to be deposed regarding the belatedly disclosed notebook; and (ii) payment of Baxalta's attorney fees and expenses in connection with the deposition.  (July 2, 2018 Hearing Tr. 33:19-34:9).  As the Federal Circuit recognized, the fact that the prevailing party has been sanctioned is important to the § 285 analysis.  *Romag*, 866 F.3d at 1340 (finding error in a court's refusal to consider the prevailing party's misconduct in a § 285 analysis).

Bayer withheld highly relevant documents, requiring Baxalta to prepare and submit supplemental expert reports.  (D.I. 313).  In particular, Bayer did not produce relevant documents regarding, for example, the inventors' and Bayer's explanations of "random" conjugation and that Adynovate® utilizes random conjugation.  These documents—which included relevant e-mails between the inventors of the '520 patent—were instead produced in the related Jivi® litigation, well after the close of fact discovery in the present case.  A number of these documents were from the same custodians Bayer agreed to search in this case and were responsive to Baxalta's document requests and fell within the parties' agreed-upon search terms.  Bayer has never provided a credible explanation for this discovery violation.

In addition, Baxalta was surprised to learn that Bayer's outside counsel transferred the entirety of Baxalta's document production (including over 2,000 documents marked as Highly Confidential-Outside Counsel Only) to Bayer's in-house computer system.  (Ex. G).  This was a

violation of the Protective Order, which required that outside counsel not "make available or communicate, in any fashion" such documents to its client.  (D.I. 54 ¶ 2(c), (h).)  It was only by coincidence that Baxalta learned of this violation at all, and it was apparent that Bayer would have continued this practice had it not been identified.  (Ex. G).

Bayer furthered its litigation misconduct by attempting to silence Dr. Clark Pan, the inventor of the '520 patent.  *First*, Bayer served a sham deposition subpoena on Dr. Pan and used it to try to elicit an agreement that he not testify at trial.  (*See* Ex. H Pan Subpoena).  After serving the notice, Bayer sought assurances from Dr. Pan and his counsel that he would not appear at trial in exchange for dropping the deposition.  (Jury Selection Tr. 112:22-113:4, 113:22-114:2, *see* D.I. 326 at 18-22 (PTO), D.I. 370, Pretrial Conference Tr. 28:23-29:3).  Dr. Pan did not agree to this and Bayer chose not to go forward with the threatened deposition, demonstrating that Bayer never intended to take the deposition in the first instance.  *Second*, Bayer repeatedly threatened to "seek legal remedies" against Dr. Pan, based on a 20-year old agreement, if Dr. Pan "does not agree to cooperate" with Bayer and "submit[s] to Baxalta's request that he testify at trial."  (Ex. I, Dec. 12, 2018 Letter).  *Third*, Bayer repeatedly accused Dr. Pan of violating assignor estoppel.  The Court rejected that argument, stating that "I don't think any of the eight factors are going to be met in terms of assignor estoppel being available." (Jury Selection Tr. 107:5-10).  Bayer's attempts to coerce inventor Dr. Pan into withholding his testimony and to exclude him from the case were improper.  Bayer's conduct further demonstrates that Bayer's present motion for fees should be denied.  *Romag*, 806 F.3d at 1340.

## IV.     Conclusion

Bayer's motion did not follow Rule 54(d)(2) and failed, among other things, to identify or estimate the amount of fees sought.  Further, Bayer's allegations of misconduct are meritless and inaccurate.  Bayer's motion for attorney's fees should be denied in its entirety.

20

*Of Counsel:*

Edgar H. Haug
Angus Chen
Porter F. Fleming
Richard F. Kurz
Erika V. Selli
Elizabeth Murphy
Haug Partners LLP
745 Fifth Avenue
New York, New York 10151
Tel: (212) 588-0800
ehaug@haugpartners.com
achen@haugpartners.com
pfleming@haugpartners.com
rkurz@haugpartners.com
eselli@haugpartners.com
emurphy@haugpartners.com

*/s/ Kelly E. Farnan*
Frederick L. Cottrell, III (#2555)
Kelly E. Farnan (#4395)
Nicole K. Pedi (#6236)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
cottrell@rlf.com
farnan@rlf.com
pedi@rlf.com

*Attorneys for Defendants*
*Baxalta Inc., Baxalta US Inc., and*
*Nektar Therapeutics*

Dated: March 15, 2019

21