IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BAYER HEALTHCARE LLC,

    Plaintiff,

v.

BAXALTA INC. and BAXALTA US INC.,

    Defendants.

No. 16-cv-1122-RGA

MEMORANDUM OPINION

Rodger D. Smith II, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Bradford J. Badke, Sona De, Ching-Lee Fukuda, Caroline Bercier, Julie L. Hsia, SIDLEY AUSTIN LLP, New York, NY; Kevin O'Brien, Sue Wang, Saurabh Prabhakar, SIDLEY AUSTIN LLP, San Francisco, CA; Gwen Hochman Stewart, Grace L.W. St. Vincent, SIDLEY AUSTIN LLP, Chicago, IL.

    Attorneys for Plaintiff.

Frederick L. Cottrell, III, Kelly E. Farnan, Nicole K. Pedi, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Edgar H. Haug, Angus Chen, Porter F. Fleming, Richard F. Kurz, Erika V. Selli, Elizabeth Murphy, HAUG PARTNERS LLP, New York, NY.

    Attorneys for Defendants.

August 26, 2019


**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are Plaintiff's motion for attorneys' fees (D.I. 420) and Defendants' related motion to strike (D.I. 473), and Plaintiff's motion pursuant to Federal Rule of Civil Procedure 59 (D.I. 437). I have reviewed the parties' briefing. (D.I. 421, 438, 440, 450, 457, 459, 473, 480, 481). For the following reasons, Plaintiff's motion for attorneys' fees is **DENIED**, Defendants' motion to strike is **DISMISSED** as moot, and Plaintiff's motion pursuant to Rule 59 is **GRANTED** with respect to supplemental damages, pre-judgment interest, and post-judgment interest, and **DENIED** with respect to indirect and willful infringement.

## I. BACKGROUND

On December 5, 2016, Plaintiff Bayer Healthcare LLC filed suit against Defendants Baxalta Inc. and Baxalta US Inc. (collectively, "Baxalta") and Nektar Therapeutics for infringement of U.S. Patent No. 9,364,520 ("the '520 patent"). (D.I. 1). I held a jury trial from January 25 to February 1, 2019.[1] The jury found each asserted claim valid and infringed and that Bayer was entitled to $155,190,264 in damages, based on a 17.78% royalty rate and $872,836,128 royalty base. (*Id.*). I granted judgment as a matter of law with respect to induced, contributory, and willful infringement by Nektar, and willful infringement by Baxalta. Tr. at 1134:24-1135:3; (D.I. 412 ¶¶ 2-3). Bayer has no remaining claims against Nektar.

## II. ATTORNEYS' FEES

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.

---

[1] I cite to the trial transcript as "Tr."

District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). In assessing the totality of the circumstances, the Court may consider "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n.6. The party seeking fees must show that a case is exceptional by a preponderance of the evidence. *Id.* at 557-58.

For the following reasons, Bayer's motion for attorneys' fees is **DENIED**. Thus, Baxalta's motion to strike a portion of Bayer's corresponding reply brief is **DISMISSED** as moot.

### A. Fair Estimate of Fees

Baxalta argues that Bayer's motion is barred because it fails to provide a fee estimate as required under Federal Rule of Civil Procedure 54(d). (D.I. 440 at 2-3). Rule 54(d)(2)(B)(iii) provides that a motion for attorney's fees must, among other things, "state the amount sought or provide a fair estimate of it."

The time to provide a fee estimate has not run. (*See* D.I. 457 at 9). Rule 54(d)(2)(B)(i) requires a motion for fees to be filed within "14 days after the entry of judgment." Rule 54(a) defines "judgment" as "a decree and any order from which an appeal lies." Where there are multiple claims:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b). The judgment entered on February 8, 2019 did not adjudicate the parties' post-trial claims under Rules 50(b) and 59(a). Therefore, I have yet to enter a final judgment that

3

would trigger the deadline on Bayer's motion for fees. *See* Fed. R. App. P. 4(a)(4)(A)(i), (v). Had I granted Bayer's present motion, Bayer would have had ample opportunity to provide an accounting of fees consistent with Rule 54(d).[2] (D.I. 457 at 10).

## B. Violation of the *Markman* Order

Bayer argues that Baxalta repeatedly disregarded the *Markman* order, which indicates the unreasonable manner in which Baxalta litigated this case. (D.I. 421 at 4-8).

Bayer points to several actions leading up to trial. (*Id.* at 4-6). During claim construction, Bayer relied on the phrase "[a]ny conjugation with [amines] is random" in the prosecution history to argue that the patentees defined any conjugation with amines as random. I rejected that theory in my *Markman* opinion, but in the context of finding no clear and unmistakable disclaimer. (D.I. 195 at 16). Baxalta raised a variation of the same argument on summary judgment. I clarified that the argument failed on claim construction and again on summary judgment because Baxalta was reading the phrase out of context. (D.I. 319 at 7-8). Although Baxalta raised the same argument on motions *in limine*, those motions were prepared and exchanged before I issued the summary judgment opinion. (D.I. 440 at 5). I explicitly stated in my order on the motions *in limine* that "Defendants should not raise this argument again in their filings or at trial." (D.I. 335 at 2).

I do not think Baxalta's pretrial behavior amounts to "unreasonable" litigation conduct. I did not clearly reject Baxalta's interpretation of my claim construction until resolving the motions for summary judgment. (*See* D.I. 440 at 4-5). Therefore, the fact that Baxalta continued to raise the "[a]ny conjugation" argument after claim construction does not make this an exceptional case.

---

[2] I expect Baxalta will appeal once the judgment is appealable. I do not express any opinion on whether Bayer's motion will become moot if the fee estimate is not provided as a supplement to the presently-filed motion.

4

Bayer also argues that Baxalta presented evidence at trial based on the rejected claim construction argument. (D.I. 421 at 7-8).

First, Bayer asserts that Baxalta tried to elicit testimony from '520 patent inventor Dr. Pan that random conjugation is equivalent to amine pegylation. (D.I. 421 at 7). I disagree. Dr. Pan was a fact witness. Baxalta focused on the pegylation done by Nektar and Bayer that Dr. Pan was involved in, not pegylation generally. *E.g.*, Tr. at 959:16-960:1, 969:12-970:5.[3] I overruled Bayer's objection that Baxalta was "coming very close to violating" the *Markman* order. *Id.* at 980:6-982:5.

Second, Bayer asserts that Baxalta's experts, Drs. Walensky and Zalipsky, testified contrary to the *Markman* order. (D.I. 421 at 7-8). Bayer did not object to any of the cited testimony at trial. Regardless, I do not think either expert violated the *Markman* order. Both discussed the lysine pegylation described in the '520 patent, which the patent characterizes as a "random approach." Tr. at 1041:7-17, 1199:5-10. Dr. Walensky also discussed the lysine pegylation used to make Adynovate and determined that it was random. *Id.* at 1047:11-1048:7, 1058:13-1059:8. Neither expert opined on amine conjugation generally. Rather, both limited their testimony to discussion of particular reactions described in the '520 patent or in making Adynovate.[4]

Therefore, I do not think Baxalta violated the *Markman* order. Baxalta was sometimes "close to the line," but that does not make its litigation conduct unreasonable.

---

[3] The testimony at trial focused on lysine pegylation. I understand lysine pegylation to be based on amine pegylation.

[4] Bayer also argues that Dr. Zalipsky violated a separate part of the *Markman* order, which stated, "'random conjugation' is a process," by opining that "the [reaction] conditions themselves have nothing to do with if the reaction is random or not random." (D.I. 421 at 8). I do not find Bayer's argument persuasive. The *Markman* order never discussed the role of reaction conditions in "random conjugation." (D.I. 195 at 7-8).

5

## C. Bad Faith in Disclosure of Supplemental Financials

Baxalta originally produced worldwide financials showing about 80% profits. (D.I. 421 at 9). About two months after the close of fact discovery, Baxalta produced supplemental financials showing lower profits and including additional costs. (D.I. 440 at 7).

I addressed the late-disclosed financials in relation to Bayer's motion to strike. (D.I. 362 at 4). I found that Baxalta engaged in bad faith or willfulness in failing to disclose the supplemental financials during fact discovery, but that, on balance, the *Pennypack* factors weighed against exclusion. (*Id.* at 4-5). I also noted that it was unclear if the supplemental financials were "litigation-inspired documents," as Bayer had suggested. (*Id.* at 6).

Bayer continues to argue that Baxalta falsified the supplemental financials. (D.I. 421 at 9-10). I do not think Bayer's argument is supported by the record. The original profit figures were based on the "cost of goods" ("COGs"), which included manufacturing costs and royalties. Tr. at 773:18-774:3. Baxalta's Rule 30(b)(6) witness, Mr. Hackel, testified that "other costs of sales" ("OCOS") were not included because Baxalta did not track those costs on the product level. *Id.* at 717:15-25. Baxalta asserts that the supplemental financials incorporated additional costs obtained from its parent company, Shire. (D.I. 440 at 7). Shire's employee, Mr. Dewan, testified that Shire keeps such records on an internal system, which is accurate and maintained in the ordinary course of business. Tr. at 1182:22-1184:10. There is no evidence that Baxalta altered or falsified the Shire data when producing the supplemental financials.

Bayer has only shown that Baxalta acted in bad faith by its late disclosure of the supplemental financials. As discussed in my order denying Bayer's motion to strike, Bayer was not substantially prejudiced by the late disclosure and the supplemental financials had a limited

scope of relevance. (D.I. 362 at 4-5). Therefore, Baxalta's late disclosure, by itself, does not make this case exceptional.

### D. Frivolous Defenses

#### 1. Section 102(f)

Bayer argues that Baxalta raised frivolous defenses under § 102(f) based on work done by Dr. Bossard and others at Nektar ("the Bossard Work"). (D.I. 421 at 11-12). Section 102(f) provides that a person shall be entitled to a patent unless "he did not himself invent the subject matter sought to be patented." Baxalta did not rely on § 102(f) as a stand-alone defense. Tr. at 1357:7-12. Instead, Baxalta argued that the Bossard Work qualified as prior art under § 102(f) and, in combination with other references, rendered the '520 patent obvious under § 103. (D.I. 440 at 13); *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403-04 (Fed. Cir. 1997) ("[S]ubject matter derived from another not only is itself unpatentable to the party who derived it under § 102(f), but, when combined with other prior art, may make a resulting obvious invention unpatentable to that party under a combination of §§ 102(f) and 103."). Specifically, Baxalta relied on the Bossard Work to demonstrate a reasonable expectation of success in retaining factor VIII activity while pegylating at the B-domain. (D.I. 440 at 14; D.I. 436 at 23-24).

It is undisputed that, prior to the date of invention, Dr. Pan received samples and data from Dr. Bossard relating to work done with pegylated factor VIII. Tr. at 961:7-12, 962:25-963:9. Dr. Pan explained that Nektar pegylated both full-length and B-domain deleted factor VIII. *Id.* at 962:25-963:9, 976:21-975:1. The lysine pegylation results showed "higher activity" with full-length factor VIII than B-domain deleted factor VIII. Thus, Dr. Pan concluded that, for lysine pegylation of full-length factor VIII, "much of the PEGylation went to the B-domain which is not needed for activity." *Id.* at 976:24-977:18, 977:25-979:13.

7

Dr. Pan's testimony shows that Nektar did do some work relating to retaining factor VIII activity while pegylating at the B-domain. Therefore, Baxalta could use the Bossard Work to argue that there was a reasonable expectation of success. The argument may have been weak, but it was not frivolous.

### 2. "functional factor VIII"

Bayer argues that Baxalta's noninfringement theory based on the "functional factor VIII" limitation was contrary to its own admission and the '520 patent. (D.I. 421 at 12-14).

I addressed this issue in relation to Bayer's motion to strike. (D.I. 362 at 9). In response to a request for admission, Baxalta stated, "Adynovate® retains functional factor VIII activity." (D.I. 216, Ex. L, RFA No. 45). I found that Baxalta's noninfringement theory was not necessarily contrary to the prior admission because the admission did not specify the amount of functional activity retained. (D.I. 362 at 9). Baxalta's expert argued that the claims required retention of a certain level of activity, which Adynovate did not meet. (*Id.*). Baxalta's theory was consistent with my express claim construction, although I clarified post-trial that it relied on an erroneous interpretation of the construction. (D.I. 501 at 20-21). I do not think Baxalta's erroneous interpretation rendered its theory frivolous.

### E. Misrepresentations to the Jury

Bayer argues that Baxalta repeatedly misled the jury during trial. (D.I. 421 at 15-17).

First, Bayer argues that Baxalta implied that the '520 patent was obtained through fraud on the PTO. (*Id.* at 15). Baxalta elicited testimony from Dr. Pan that he signed the inventor declaration in 2006, three years before the '520 patent application was filed. Tr. at 1023:15-25. I indicated during trial that Baxalta's questioning was misleading because the inventor declaration was filed with the provisional patent application, which had the same specification as

8

the '520 patent. *Id.* at 1025:12-15. Baxalta immediately corrected itself by confirming with Dr. Pan that the specifications were the same. *Id.* at 1026:16-23.

Second, Bayer argues that Baxalta improperly compared Adynovate with Bayer's product, Jivi. (D.I. 421 at 15-16). Bayer only cites to one line of questioning. (*Id.* at 16). Bayer objected to the testimony at trial and I sustained the objection. Tr. at 1061:6-11, 1063:7-10. I also gave a limiting instruction to the jury. *Id.* at 1063:11-19.

Third, Bayer argues that Baxalta made two misrepresentations during closing arguments. (D.I. 421 at 17). Baxalta stated that Dr. Pan's lab notebook contained data from Nektar. Tr. at 1567:11-22. That appears to be supported by the record. As discussed, Dr. Pan testified that he received data and samples from Nektar relating to factor VIII pegylation. It appears that some of those samples are referenced in Dr. Pan's notebook. (*See* D.I. 440 at 17). Baxalta also stated that inventor Dr. Murphy described lysine pegylation as random in a 2007 email. Tr. at 1538:14-24. Bayer argues that Baxalta mischaracterized the email as an admission that Adynovate was randomly pegylated. (D.I. 421 at 17). I disagree. Baxalta merely described the contents of the email and never mentioned Adynovate.

I do not think Baxalta misled the jury in any meaningful way. Therefore, Bayer has failed to show that Baxalta acted in bad faith or otherwise presented evidence in a manner that supports an exceptional case finding.

### F. Pattern of Delayed Disclosures

Bayer asserts that Baxalta engaged in a pattern of delayed disclosures that disrupted the orderly presentation of evidence at trial. (D.I. 421 at 17-20). Specifically, Bayer argues that Baxalta failed to timely narrow its invalidity theories.[5]

---

[5] Bayer's remaining arguments are meritless. Bayer argued that Baxalta (1) introduced new theories during discovery, (2) disclosed "excessive numbers of exhibits" each night during trial, and (3) attempted to exclude

9

Bayer argues that, at the pretrial conference, Baxalta had seventeen invalidity theories based on six statutory grounds. (D.I. 421 at 18; D.I. 370 at 63:8-13). Baxalta narrowed its defenses to five statutory grounds during Bayer's case-in-chief but did not identify specific theories. Tr. at 565:6-17. Ultimately, Baxalta only presented evidence on three theories based on three statutory grounds. *Id.* at 1207:3-16 (indefiniteness), 1210:2-17 (enablement and obviousness).

Bayer argues that this case is analogous to *SRI International, Inc. v. Cisco Systems, Inc.*, 254 F. Supp. 3d 680 (D. Del. 2017), *aff'd in relevant part*, 930 F.3d 1295, 1310-11 (Fed. Cir. 2019). In *SRI*, the Federal Circuit affirmed this Court's exceptional case finding where Cisco created a substantial amount of work that was "needlessly repetitive or irrelevant or frivolous," maintained nineteen invalidity theories until the eve of trial but only presented two at trial, and pursued defenses at trial that were contrary to the Court's rulings or Cisco's internal documents. 930 F.3d at 1310-11.[6] In particular, Bayer argues that, like Cisco, Baxalta maintained seventeen invalidity theories until the eve of trial but only presented three at trial. (D.I. 421 at 20).

I agree that Baxalta failed to timely narrow its invalidity defenses. However, I think *SRI* is distinguishable. Cisco engaged in a plethora of unreasonable behaviors.[7] The Court noted,

> There can be no doubt from even a cursory review of the record that Cisco pursued litigation about as aggressively as the [C]ourt has seen in its judicial experience. While defending a client aggressively is understandable, if not laudable, in the case at bar, Cisco crossed the line in several regards.

---

portions of Bayer's expert testimony. (D.I. 421 at 19-20). I addressed the first point in denying Bayer's motions to strike. (D.I. 362). On the second point, it appears that both parties disclosed large numbers of exhibits. (D.I. 457 at 4-5). Regardless, I do not think "excessive" disclosure of exhibits is grounds for finding an exceptional case. On the third point, Baxalta acted appropriately to preserve its rights for appeal.

[6] Despite finding no error in the Court's exceptional case determination, the Federal Circuit vacated the award of attorneys' fees and remanded for further consideration based on two unrelated grounds. *SRI*, 930 F.3d at 1308, 1311 (finding the Court (1) relied in part on the jury's willfulness finding, which was not supported by substantial evidence, and (2) erred in calculating the attorneys' fees).

[7] On remand from the Federal Circuit, *SRI* has been reassigned to me. To be clear, I am only relying upon what has been stated in the two reported opinions.

*SRI*, 254 F. Supp. 3d at 722. Baxalta did not approach engaging in the level of pervasive misconduct seen in *SRI*. While the late disclosure of invalidity theories was not what I expect from responsible litigants, it does not, by itself, make this case exceptional.

### G. Totality of the Circumstances

A district court makes an exceptional case determination in an exercise of discretion, considering the totality of the circumstances. *Octane Fitness*, 572 U.S. at 554. Although Baxalta came close to crossing the line on several occasions, I do not think this case "stands out from others" with respect to the strength of the litigation positions or the unreasonable manner in which the case was litigated. *See id.* Viewing the record as a whole, and with the experience of having presided over more than fifty patent trials, I find that Bayer has failed to meet its burden of showing that this is an exceptional case warranting attorneys' fees.

### III. SUPPLEMENTAL DAMAGES AND INTEREST

For the following reasons, Bayer's motion for supplemental damages, prejudgment interest, and post-judgment interest is **GRANTED**.

### A. Supplemental Damages

The jury awarded damages for the period from June 14, 2016 through November 30, 2018. Supplemental damages cover the period from December 1, 2018 through February 8, 2019, the date of judgment. (D.I. 438 at 3). Bayer seeks supplemental damages at the 17.78% royalty rate determined by the jury. (*Id.*).

Baxalta argues that awarding supplemental damages would violate its Seventh Amendment right to a jury trial. (D.I. 450 at 1-2). I disagree. "[T]he amount of supplemental damages following a jury verdict is a matter committed to the sound discretion of the district court." *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1384 (Fed. Cir. 2013) (rejecting

11

defendants' argument that they had a right to a jury trial with respect to new factual issues raised by plaintiff's claim for supplemental damages).

Bayer has calculated supplemental damages based on actual Adynovate sales from December 1, 2018 to January 31, 2019, and estimated sales from February 1 to 8, 2019.[8] Baxalta produced projected sales data for the supplemental damages period prior to trial but did not produce the actual sales data until March 2019. (D.I. 450 at 2; D.I. 459 at 2-3). Baxalta argues that Bayer should have used the projected data to cover the supplemental damages period at trial. (D.I. 450 at 2).

The projected sales were substantially higher than the actual sales. (D.I. 459 at 2). I think it was reasonable for Bayer to limit its damages at trial to the period for which it had actual sales data. Accordingly, I will award Bayer supplemental damages for the period from December 1, 2018 through February 8, 2019, based on the actual sales data for that period and a 17.78% royalty rate.

## B. Prejudgment Interest

Prejudgment interest should be awarded "absent some justification for withholding such an award." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). Bayer seeks prejudgment interest at the prime rate, compounded quarterly. (D.I. 438 at 4). Baxalta argues that prejudgment interest should be calculated at the Treasury bill rate, compounded annually. (D.I. 450 at 4-6).

This Court has noted that "the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money,

---

[8] Bayer estimated the February sales because Baxalta indicated that the actual sales data would not be available until late March 2019. (D.I. 438 at 3). Now that it is August 2019, I expect the actual February sales data is available. Bayer should calculate the supplemental damages using that actual data.

which is a better measure of the harm suffered as a result of the loss of the use of money over time." *Finjan Software, Ltd. v. Secure Computing Corp.*, 2009 WL 2524495, at *13 (D. Del. Aug. 18, 2009), *aff'd in part, rev'd in part on other grounds*, 626 F.3d 1197 (Fed. Cir. 2010) (citations and quotation marks omitted).

Baxalta argues that the Treasury bill rate should apply because there is no evidence that Bayer needed to borrow money as a result of being temporarily deprived of the damages award. (D.I. 450 at 5). However, "it is not necessary that a patentee demonstrate that it borrowed at the prime rate in order to be entitled to prejudgment interest at that rate." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

Baxalta refers to its own license agreement with Nektar as a "[s]tandard quarterly royalty" agreement. (D.I. 450 at 7). Under the agreement, Baxalta (referred to as "Baxter") agreed to make quarterly royalty payments, wherein any amounts past due would accrue "interest at the rate of prime plus two percent (2%) per annum." (D.I. 451, Ex. 2, Ex. E § 10.3). Therefore, it seems that standard industry practice includes interest at the prime rate, or above, compounded quarterly.

Baxalta also argues that, should quarterly compounding apply, Bayer overinflates its interest calculations.

First, Baxalta argues that Bayer improperly estimated quarterly Adynovate sales. (D.I. 450 at 7). Baxalta only produced annual sales revenues for 2017 and 2018. Bayer's expert, Dr. Addanki, evenly distributed the sales across each quarter. (D.I. 439, Ex. B, Ex. 1). Baxalta's expert, Dr. Rausser, distributed the sales based on a quarterly growth rate of 9.5%, which he estimated from the annual data. (D.I. 451, Ex. 2 ¶ 6). Given the uncertainty of quarterly growth year-to-year, I think Dr. Addanki takes the better approach.

13

Second, Baxalta argues that Bayer failed to account for a grace period after the end of each quarter. (D.I. 450 at 7). Baxalta relies on its agreement with Nektar, which did not make royalty payments due until 45 days after the end of the calendar quarter. The date of judgment is February 8, 2019. (D.I. 412). Therefore, even assuming a 45-day grace period applies, all royalties up to the last quarter of 2018 would have been past due by the date of judgment. Regardless, I do not think Baxalta has shown that a grace period must apply.

Accordingly, I will award Bayer prejudgment interest at the prime rate, compounded quarterly.[9]

## C. Post-Judgment Interest

Post-judgment interest is governed by 28 U.S.C. § 1961. Section 1961(a) provides, "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."

Accordingly, I will award Bayer post-judgment interest at the Treasury bill rate as defined in § 1961(a), compounded annually.

## IV. INDIRECT AND WILLFUL INFRINGEMENT

I granted Defendants' motion for judgment as a matter of law under Rule 50(a) with respect to induced and contributory infringement by Nektar, and willful infringement by Nektar and Baxalta. Tr. at 1134:24-1135:3; (D.I. 412 ¶¶ 2-3; *see also* D.I. 383; D.I. 384 at 9-12). Bayer now moves for a new trial on both indirect and willful infringement under Rule 59(a). (D.I. 438 at 6-10). For the following reasons, Bayer's motion for a new trial is **DENIED**.

---

[9] This is what I have done in other cases. *E.g., Nox Med. Ehf v. Natus Neurology Inc.*, 2018 WL 4062626, at *8 (D. Del. Aug. 27, 2018); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 6118447, at *11 (D. Del. Nov. 20, 2013), *aff'd*, 597 F. App'x 630 (Fed. Cir. 2015).

14

## A. Indirect Infringement

While direct infringement is a "strict-liability offense," indirect infringement considers the defendant's mental state. *Commil USA, LLC v. Cisco Systems, Inc.*, 135 S. Ct. 1920, 1926 (2015). "[L]iability for inducing infringement attaches only if the defendant knew of the patent and that the induced acts constitute patent infringement." *Id.* at 1926 (internal quotation marks omitted). "Like induced infringement, contributory infringement requires knowledge of the patent in suit and knowledge of patent infringement." *Id.* Therefore, knowledge of the patent alone cannot support a finding of indirect infringement. A plaintiff may meet the knowledge requirement through circumstantial evidence. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 408 (Fed. Cir. 2018).

Bayer argues that the evidence at trial showed that Nektar was aware of the '520 patent and knew that Adynovate infringed. (D.I. 438 at 6-10). Thus, there was sufficient evidence for a reasonable jury to find indirect infringement by Nektar.

It is clear that Nektar was aware of the '520 patent. *See, e.g.*, Tr. at 416:7-417:15. Bayer argues that Nektar must have also known that Adynovate infringed "because it is functional factor VIII PEGylated at the B-domain as claimed in the '520 patent." (D.I. 438 at 7). Bayer relies on the fact that Nektar helped develop Adynovate, which involved pegylation at the B-domain of factor VIII. *See* Tr. at 498:18-499:1, 906:1-25.

There is no evidence that Nektar believed Adynovate infringed the '520 patent. Bayer assumes that Nektar knew Adynovate infringed simply because it involved pegylation at the B-domain. I do not think that is enough to show knowledge of infringement. *Cf. Enplas*, 909 F.3d

15

at 408 (recognizing that it was a "close case," but holding a reasonable jury could find that Enplas intended to induce its customers' infringement where, among other things, Enplas was informed that the lenses it manufactured and sold were covered by the asserted patents). A key issue for infringement at trial was whether Adynovate met the "isolated polypeptide conjugate" limitation, which I construed as "a polypeptide conjugate where conjugation was not random." (D.I. 200). I do not think the fact that Adynovate was pegylated at the B-domain, by itself, is sufficient to show that Nektar knew Adynovate was the result of non-random pegylation. *See, e.g.*, Tr. at 469:1-12 (Plaintiff's expert, Dr. Ploegh, agreeing that random pegylation allows PEG to attach at any available site of reaction throughout the protein and that PEGs may attach on any available site of reaction in Adynovate). Therefore, as I determined under Rule 50(a), there was insufficient evidence at trial to support a finding of indirect infringement by Nektar.

## B. Willful Infringement

Under *Halo Electronics, Inc. v. Pulse Electronics*, "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." 136 S. Ct. 1923, 1933 (2016). Subjective willfulness is met with proof, by a preponderance of the evidence, that "the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer." *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362, 1364 (Fed. Cir. 2016) (internal citation and quotation marks omitted).

Again, it is undisputed that Baxalta and Nektar were aware of the '520 patent. (*See* D.I. 438 at 10-11; D.I. 450 at 10-11). And again, Bayer assumes that Defendants knew Adynovate infringed because it involved pegylation at the B-domain of factor VIII. (D.I. 438 at 11). For the reasons discussed, I do not think that is enough for a reasonable jury to find that infringement

was "either known or so obvious it should have been known." *See Halo*, 136 S. Ct. at 1930. Therefore, as I determined under Rule 50(a), there was insufficient evidence at trial to support a finding of willful infringement by either Nektar or Baxalta.

## V. CONCLUSION

A separate order will be entered.